## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| JESSICA BENEFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:13-cv-1000 |
| v. | ) | JUDGE CRENSHAW |
| | ) | |
| MSTREET ENTERTAINMENT, LLC, | ) | |
| VIRAGO, LLC, and CHRIS | ) | |
| HYNDMAN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Jessica Benefield brings claims against Defendants Virago, LLC ("Virago"), and MStreet Entertainment, LLC ("MStreet") (collectively "MStreet"), alleging gender discrimination, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000 *et seq*.) and the Tennessee Human Rights Act ("THRA") (Tenn. Code Ann. § 4-21-101, *et seq*.). She brings retaliation claims under the Tennessee Public Protection Act ("TPPA") (Tenn. Code Ann. § 50-1-304) and Tennessee common law. She also brings a claim against Chris Hyndman for tortious interference with employment under Tennessee common law. Before the Court is MStreet's motion for summary judgment. (Doc. No. 46.) The primary dispute in this action is whether Benefield was fired for cause or in retaliation for sending an email to MStreet's Human Relations Director about harassment and gender discrimination. MStreet's motion is **GRANTED** as to Benefield's claims for discrimination and hostile work environment under Title VII and the THRA, her claim for retaliation under the TPPA, and her claim for tortious interference with employment. The motion is **DENIED** as to Benefield's claims for retaliation under Title VII, the THRA, and Tennessee common law. The Court finds disputed issues of material fact regarding

whether the decision to terminate Benefield was "actually motivated" by Benefield's protected activity or by her job performance deficiencies or insubordination.

## I. Factual Background

### A. Benefield's Performance as Executive Chef

In June 2011, Jessica Benefield became Executive Chef at Virago, one of four restaurants owned and operated by MStreet in Nashville, Tennessee. (Doc. No. 65 at 6.) Chris Hyndman opened Virago in 2000 and partnered with investors to form MStreet in 2009. MStreet is the parent company of Virago. Hyndman is 50% owner of MStreet and serves as its Chief Operating Officer. (Doc. No. 65 at 1-2.) MStreet's Director of Operations is Eric Martino. Martino provides leadership and coaching to all Executive Chefs and General Managers of MStreet, including conducting evaluations, attending meetings for chefs, managers, and directors, and initiating one-on-one coaching conversations to help managers meet the goals of the business. (Id. at 8.)

Virago hired Benefield in November 2010 to work in the kitchen as an expediter, a position that ensures food quality and consistency. (Doc. No. 65 at 5.) Prior to working at Virago, Benefield had worked in the kitchens of Hyndman's restaurants off and on since 2007. (Id.) Benefield enjoyed some successes as a chef. For example, MStreet selected her from among the other chefs to represent it in the Iron Fork Competition, an annual competition organized by the Nashville Scene, an alternative weekly newspaper in Nashville, Tennessee. (Id. at 22.) Benefield won that competition. (Id.) In the spring of 2013, a cooking website selected her to be featured as "chef of the week," which also garnered recognition for Virago. (Doc. No. 134-1 at 3.)

Despite enjoying some aspects of her work at MStreet, Benefield was uncomfortable with Hyndman's relationship with women in the workplace, although she does not identify or allege any untoward conduct by Hyndman to her. Benefield also alleges that Hyndman micromanaged

and criticized her work in a way that he did not do to the male Executive Chefs at the other MStreet restaurants. However, she admits that the requests made of her were no different than those made of the other Executive Chefs of MStreet and that Hyndman and Martino had the same oversight and direction over all the Executive Chefs. (Doc. No. 65 at 22-23.) She never made a formal complaint of gender-based discrimination or hostile work environment until June 21, 2013, when she sent an email complaining about these issues to Ryan Watkins, MStreet's Human Relations Director.

MStreet's directors also had concerns about Benefield. MStreet formally documented its concerns with her behavior once on April 30, 2012 and twice on May 14, 2012. (Doc. No. 49-15 at 49-52.) MStreet did not provide the documentation of these incidents or describe them, but it has provided evidence of the nature of management's concerns with Benefield's performance. First, the directors felt that Benefield did not work well with the culture of Virago. For example, they claim that she created an adversarial relationship between the back of the house staff (i.e., staff involved in the production of food) and the front of the house staff (i.e., hosts, servers) by doing things such as terminating the right of front of the house staff to order meals for themselves during a shift, turning off the printer so servers could not send more orders to the kitchen, and generally having a bad attitude and being uncooperative with front of the house staff (Doc. Nos. 134-1; 77-1 at 56; 49-18 at 64-65; 56-6 at 24-26[1]). Benefield denies all but the first of these allegations.

Second, MStreet's directors had concerns about Benefield's temper. For example, Benefield does not dispute that she engaged in a loud and profanity-laced verbal altercation with the Culinary Director and his wife in front of the restaurant, which caused the Director to

---

[1] Unless otherwise noted, citations to depositions are to the deposition transcript's original pagination, as the CM/ECF pagination is obscured on many pages.

recommend her termination. (Doc. No. 65 at 13.) She admits that Hyndman arbitrated the dispute and allowed her to remain in her position. (Id.)

Third, MStreet's directors had concerns about Benefield's ability to manage the business side of her duties as Executive Chef. In the first two quarters of 2013, Virago lost money for the first time in 13 years, while MStreet's three other restaurants remained highly profitable. (Doc. Nos. 77-1 at 126, 203-04; 50 at 2.) Martino and Hyndman felt that Virago's profitability was being negatively impacted by an excess of labor and food costs caused by Benefield's overscheduling of staff, refusal to release staff on slower nights or at the end of the shift, over-ordering and stockpiling inventory, and not using every part of food items in order to reduce waste. (Doc. No. 77-1 at 204-08; 56-9 at 90.)[2] Benefield admits that Virago's problems were discussed among the MStreet directors. (Doc. No. 65 at 10.)

MStreet's management's concerns about the decline in Virago's profitability culminated in an emergency meeting called by Hyndman on June 18, 2013, which included the MStreet directors and Virago's management team. (Doc. Nos. 49-11 at 156-61; 77-1 at 75-79.) The purpose of the meeting was to alert the team about Virago's lack of profitability. (Id.) Hyndman made it clear at the meeting that he would be focusing on Virago to help address its lack of profitability by increasing his presence in the restaurant and actively observing operations. (Id.; Doc. No. 65 at 11.)

---

[2] Benefield counters by pointing to February 4, 2013 text messages between Martino and Grimsley, in which he sought to meet with Grimsley to "focus on Virago staffing and labor," because of the "need to streamline significantly."[2] (Doc. No. 136-1 at 4.) The General Manager governs front of the house staff, and the Executive Chef governs back of the house. (Doc. No. 56-9 at 10-12; 75-3 at 32 (organizational chart).) Martino's text messages about staffing issues does not disprove that MStreet had concerns with Benefield's management of costs in her sphere of authority, but instead shows that the management was working with the leaders of both the front and back of the house to reduce costs.

4

### B.  June 20, 2013 Conflict at Virago

On the evening of June 20, 2013, Hyndman's concerns about overstaffing in the back of the restaurant culminated in a dispute at Virago between him and Benefield. When Hyndman arrived at the restaurant that evening, he felt that, once again, there were too many staff members in the back of the restaurant relative to the level of business. (Doc. No. 77-1 at 8-081, 84-86, 81-93.) Hyndman told Kristina Lucia, then General Manager, to tell Benefield to send home some of the staff in the back of the restaurant. Lucia was hesitant to speak to Benefield about releasing staff because she was "prickly about the kitchen and suggesting changes, especially from Mr. Hyndman." (Doc. No. 52 at 3 (Lucia Decl.).)

Hyndman watched the kitchen throughout the evening, which was upsetting to Benefield. (Doc. No. 49-21 at 173; 52 at 4; 56-6 at 40.) Around 6:45 p.m., Benefield initiated the following exchange of text messages with Martino:

> Benefield: We're going to need to sit down & discuss this harassment situation Chris keeps putting me in. He's in here right now demanding we cut kitchen staff. I already did. I'm not going to work this way.
> Martino: Ok. Let's [you] and me meet up tomorrow around 1 to talk about it. Does that work?
> Benefield: Nope. You need to be here now. I just cut half the kitchen & all the [server assistants]. I'm about to walk out. He is standing in the kitchen trying to intimidate me. And he just told Kristina, verbatim, that it is [now her] job to do whatever you & him tell her to.

(Doc. No. 136-1 at 2.) Martino came to Virago in response to Benefield's text messages. (Doc. No. 56-9 at 235.)

Though the parties dispute who was responsible for releasing too many staff members, they agree that so many staff members were sent home that the guests' wait times for food became unacceptably long, going from the usual 15 minutes to 45 minutes or longer. (Doc. No. 65 at 18.) As a result, Virago did not charge a number of guests for meals that were as much as $400 to $500.

5

(Doc. Nos. 56-9 at 126; 77-1 at 94, 105-06.) MStreet contends that Benefield was responsible for sending far more people home than Hyndman had suggested. (Doc. No. 52 at 3; 56-6 at 40.) Benefield counters that "any cuts to kitchen staff were made by others pursuant to the order by Chris Hyndman." (Doc. No. 65-1 at 1.) Lucia and Martino maintain that, at some point in the evening, Benefield said, "We'll cut everybody and let this whole fucking place burn down." (Doc. No. 52 at 3; 56-9 at 63.) Benefield denies making that or any other statement suggesting her intention to sabotage the restaurant. (Doc. No. 65-1 at 1.)

### C. The Decision to Terminate Benefield

It is undisputed that at 10:37 a.m. on June 21, 2013, Benefield sent Watkins an email expressing concerns about Hyndman's behavior toward women employees of MStreet in general, as well as his treatment of her, in particular, the previous night. That email included the following:

> I am writing to you in [an] attempt to convey the seriousness of the problem that is Chris Hyndman's actions towards women. These actions are not any secret and in fact it is discussed regularly throughout the company how uncomfortable he makes situations, but perhaps the severity of these situations has not been properly expressed.

(Doc. No. 1-3.) The email also describes Benefield's perceptions of Hyndman as being "bullying," "aggressive," and "intimidating" in the kitchen of Virago the previous night and complains that Martino dismissed her concerns as "emotional" and talked down to her. She stated that this was not the first time she and others had expressed concerns with Martino, nor was it the first time he had been dismissive of those concerns. She also stated that she had asked Martino, "if it was common practice for Chris to regularly commandeer the kitchens of any of the male Chefs in the company, as this is not the first or second instance of this behavior in mine." The email ends as follows:

> There are too many accounts of comments from Chris' mouth regarding how a female employee could "tighten it up a little" or what "kind" of hot they are; far-

away hot, up-close-and-personal hot, or "like one of those dirty 19-year olds" hot. There are multiple instances of verbal attacks from him towards female servers resulting in their crying and not desiring to finish their shift and/or wait on him ever again.

I'm not excited to be the voice in this matter, nor bring it to you, but other efforts have proven unfruitful and Virago is no longer a comfortable work environment that one can look forward to growing in for many women. I appreciate any and all help you can offer in the matter. Thank you in advance.

(Id.)

The parties dispute the timing of MStreet's decision to terminate Benefield and the reasons that motivated its decision. MStreet's version of the facts is as follows. Martino decided the night of June 21st to terminate Benefield based on what he felt was egregious behavior, in which she had "compromise[d] the guest experience." (Doc. No. 56-9 at 120-22, 130.) He called Hyndman around 8:00 a.m. the next morning to get his permission to terminate her employment. (Id.; Doc. Nos. 77-1 at 93-95, 121; 70.) Martino told Hyndman about Benefield's text messages to him the previous night. (Doc. No. 77-1 at 93.) Hyndman felt that her commanding Martino, her superior, to come to the restaurant, "further showed and illustrated how delusional and distorted things had become, insubordination, lack of respect, communication, teamwork, professionalism, all those things." (Id.) Martino and Hyndman claim that they had already made the decision to terminate Benefield before they learned of her email to Watkins. After deciding to terminate her, they agreed to contact Ryan Watkins, the Director of Human Resources, for advice on how to handle the termination. (Id. at 120-22.)

Benefield's version of the facts is that the decision to terminate her was made after receiving her email and was done in retaliation for her email. To support this, Benefield primarily relies on the reasons MStreet gave to her, to the Tennessee Department of Labor ("Tennessee DOL"), and to the Equal Employment Opportunity Commission ("EEOC") for her termination.

7

First, the separation notice, signed by Watkins, stated the following reasons for the termination: "Inability to manage and operate restaurant efficiently. Refusal to cooperate in the implementation of necessary operational and management procedures and making false and malicious statements regarding superiors." (Doc. No. 1-4.) Hyndman identified the statements in Benefield's e-mail, a conversation she had with Martino, and text messages she had sent to Martino, as the statements he considered to be "malicious," "unprofessional," and "hostile." (Doc. No. 77-1 at 140-41.) Hyndman also testified that the email was, "in and of itself," "reason for termination" because "it contains . . . an amazing amount of false information," and also "displays a particular tone and a frame of mind . . . that's toxic and isn't one that you can carry on a progressive or productive working relationship with." (Id. at 138-39.)

Second, Benefield points to the information MStreet provided to the Tennessee DOL in response to its request for information regarding Benefield's termination for the purposes of evaluating her claim for unemployment benefits. MStreet provided, verbatim, the same language used in the separation notice. (Doc. No. 151-7 at 52.) Watkins also sent an email to the investigator which stated: "Attached are Mrs. Benefield's separation notice and the email that played a heavy role in determining her termination. . . . Her separation was ultimately determined by her releasing employees too early in anger, causing the restaurant's customers to suffer long wait times for food, and the email . . . sent to me the day after." (Id. at 51.) Watkins attached a copy of Benefield's June 21, 2013 email. (Id. at 52.) Watkins' email had an attachment that he labeled "Benefield, Jessica- Term Cause Email.pdf." (Id. at 51.)

Third, Benefield points to MStreet's August 13, 2013 response to her June 27, 2013 EEOC charge (Doc. No. 75-3) in which it listed, verbatim, the same reasons for the termination that it had listed in the separation notice (Id. at 23.)

8

On September 17, 2013, the EEOC issued a right-to-sue letter. (Doc. No. 1-1.) On September 18, 2013, Benefield filed the instant action. (Doc. No. 1.)

**D.  Spoliation of Evidence**

A number of discovery disputes arose during the briefing of MStreet's motion for summary judgment, as explained in detail in Judge Trauger's prior orders. (Doc. Nos. 124-125, 131.) The only dispute relevant to the consideration of MStreet's motion for summary judgment, however, relates to Benefield's request for text messages stored on the phones of key officers and employees of MStreet, which may have contained content relevant to the matters at issue in this case. (Doc. No. 124 at 3-4.)

After the close of discovery, MStreet discovered that it *had* recovered text messages from Martino's phone from the relevant time frame, which had been unintentionally overlooked. (Id. at 7.) Judge Trauger concluded that MStreet should have preserved the text messages of its key management and employees and that there was no justification for their failure to do so. (Doc. No. 124 at 14.) Accordingly, she ordered that she would give a spoliation instruction to the jury, should the matter proceed to trial. (Id.)

On April 25, 2016, the parties filed supplemental briefs and evidence, including some of the Martino text messages. (Doc. Nos. 134-1, 136-1, 138-1.) In particular, Benefield's supplemental brief raises the following arguments relevant to the pending motion. Watkins admitted he was mistaken in his prior deposition testimony when he stated that Martino was in his office when he received Benefield's email, as the texts demonstrate that the men were not together at that point (Id. at 14). The texts between Martino and Watkins the morning of Benefield's termination were related to Martino's displeasure with Hyndman, not with the need to terminate Benefield's employment (Id. at 15). Watkins admitted he had discussed with other MStreet

9

employees what he "was supposed to discuss" in the depositions. (Id. at 16.)

## II.     Legal Standards

### A.  Summary Judgment

Before granting a motion for summary judgment, the Court must find that "there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party bringing the summary judgment motion bears the initial burden of establishing the nonexistence of any issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). This burden may only be satisfied by "citing to particular parts of materials in the record..." or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating 'an absence of evidence to support the nonmoving party's case.'" Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (citing Celotex, 477 U.S. at 325).

When the moving party has made the required showing, the nonmoving party must set forth specific facts showing that there is a genuine dispute for trial. See Fed. R. Civ. P. 56(c). A genuine dispute exists if a reasonable jury could review the evidence and return a verdict for the nonmoving party. Wasek v. Arrow Energy Servs., 682 F.3d 463, 467 (6th Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Phelps v. State Farm Mut. Auto. Ins. Co., 680 F.3d 725, 735 (6th Cir. 2012) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). Reliance on the pleadings is insufficient. Celotex, 477 U.S. at 324. Instead, the nonmoving party "must adduce concrete evidence on which a reasonable juror could return a verdict in [its] favor." Stalbosky v. Belew, 205 F.3d 890, 895 (6th Cir. 2000)

(citations omitted); see Fed. R. Civ. P. 56(c)(1). The court does not have the duty to search the record for such evidence. See Fed. R. Civ. P. 56(c)(3); InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989).

### B. Spoliation of Evidence and Summary Judgment

In reviewing MStreet's motion for summary judgment, the Court must also consider the impact of Judge Trauger's decision that a spoliation instruction will be given at trial, based on MStreet's failure to preserve the text messages of its key managers and employees. (Doc. No. 124 at 14.) "An adverse inference of spoliation can be relevant on summary judgment." Schreane v. Beemon, 575 F. App'x 486, 490 (5th Cir. 2014). A spoliation instruction informs the jury that it may draw an adverse inference that a party who intentionally destroys important evidence in bad faith did so because the contents of those documents were unfavorable to that party. Carlson v. Fewins, 801 F.3d 668, 678 (6th Cir. 2015), reh'g denied (Sept. 29, 2015); Webb v. United States, 789 F.3d 647, 669 (6th Cir.2015), cert. denied sub nom. Drzewiecki v. Carlson, 136 S. Ct. 1658 (2016), and cert. denied, 136 S. Ct. 1658 (2016); Beaven v. U.S. Dep't of Justice, 622 F.3d 540, 553 (6th Cir. 2010) (quoting Byrnie v. Cromwell, Bd. of Educ., 243 F.3d 93, 107 (2d Cir. 2001)); Whitt v. Stephens Cnty., 529 F.3d 278, 284 (5th Cir. 2008). However, in considering a spoliation instruction, the court must determine, as best it can, "what the missing evidence may have revealed." Kronisch v. United States, 150 F.3d 112, 127 (2d Cir. 1998). As the goal is to "place the innocent party in the same position he would have been in had the evidence not been destroyed by the offending party," the court must determine "that the destroyed evidence would have been *relevant* to the contested issue." Id. (emphasis added).

"[D]estruction of evidence, standing alone, is [not] enough to allow a party who has produced no evidence—or utterly inadequate evidence—in support of a given claim to survive

summary judgment on that claim." <u>Kronisch v. United States</u>, 150 F.3d 112, 128 (2d Cir. 1998). However, in "borderline cases, an inference of spoliation, in combination with some (not insubstantial) evidence for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." <u>Byrnie</u>, 243 F.3d at 107; <u>accord</u> <u>Schreane</u>, 575 F. App'x at 490; <u>Talavera v. Shah</u>, 638 F.3d 303, 312 (D.C. Cir. 2011) ("The spoliation inference must be considered along with [the plaintiff's] other admissible evidence regarding unlawful gender discrimination.")

### C. Legal Standards for Title VII and THRA Claims

Benefield's claims under Title VII and the THRA for hostile work environment, discrimination, and retaliation are evaluated under the same standards.[3] Title VII "affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult," and thus prohibits conduct that is "sufficiently severe or pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment." <u>Meritor Savings Bank v. Vinson</u>, 477 U.S. 57, 65, 67 (1986); <u>accord</u> <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993). Title VII also makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Last, Title VII's antiretaliation provision provides the following:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

---

[3] The analysis for discrimination claims brought under Title VII and the THRA is the same. <u>See</u> <u>Bobo v. United Parcel Serv., Inc.</u>, 665 F.3d 741, 757 (6th Cir. 2012) ("Tennessee courts look to federal cases applying federal anti-discrimination statutes as the baseline for interpreting and applying the THRA.").

42 U.S.C. § 2000e-3(a).

Where, as here, a plaintiff has only circumstantial evidence of a violation of Title VII, courts apply the three-part burden-shifting framework developed by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and later modified by Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), to determine whether the plaintiff has proffered sufficient evidence to survive summary judgment. Jackson v. VHS Detroit Receiving Hosp., Inc., 814 F.3d 769, 776 (6th Cir. 2016). Under the McDonnell Douglas/Burdine framework, the plaintiff bears the initial "not onerous" burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. White v. Baxter Healthcare Corp., 533 F.3d 381, 391 (6th Cir. 2008) (quoting Burdine, 450 U.S. at 253). The elements of a *prima facie* case vary, depending on the nature of the claim, as the Court will address further below. "Once the plaintiff establishes this *prima facie* case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." Id. If the defendant meets this burden, "the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." Id. at 391–92.

The plaintiff's burden to show pretext "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." Burdine, 450 U.S. at 256. "Thus, on summary judgment, in evaluating pretext and the plaintiff's ultimate burden, the court should consider all probative evidence in the light most favorable to the plaintiff, including the evidence presented in the prima facie stage." Jackson, 814 F.3d at 779 (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination.")). The plaintiff can demonstrate that the proffered reason was in fact a pretext

designed to conceal unlawful discrimination by offering evidence that the employer's stated reason: (1) had no basis in fact, (2) did not actually motivate the employer, or (3) was insufficient to warrant the adverse employment action. Loyd v. Saint Joseph Mercy Oakland, 766 F.3d 580, 590 (6th Cir. 2014).

## III.  Analysis

Benefield brings claims against MStreet for gender discrimination, hostile work environment, and retaliation under Title VII and the THRA. She also brings retaliation claims against MStreet under the TPPA and Tennessee common law and a tortious interference with employment claim against Hyndman under Tennessee common law.

As an initial matter, the Court will only consider the impact of the spoliation of evidence issue as it relates to Benefield's retaliation claim, as Benefield's counsel stated at the Court's June 20, 2016 status conference that the missing text messages would be related only to her retaliation claim. (June 20, 2016 Transcript at 5.) The parties have provided all of Benefield's and Martino's text messages relevant to this matter to the Court.[4] If Hyndman or Martino had sent any text messages to her that supported Benefield's claims of gender-based discrimination or hostile work environment, those would have been preserved on her cell phone.

### A.  Title VII and THRA Hostile Work Environment Claims

Benefield alleges that MStreet is liable for a hostile work environment caused by Hyndman, who, she alleges made inappropriate comments about the appearances of women staff members and had a reputation for having sexual relationships with several female staff members.

Under the first step of the McDonnell Douglas framework, Benefield must establish a *prima facie* case of a hostile work environment by showing: (1) she is a member of a protected

---

[4] Counsel for both parties agreed that all of Martino's text messages were recovered. (6/20/16 Transcript at 9.)

class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her protected status; (4) the harassment unreasonably interfered with her work performance by creating an environment that was intimidating, hostile, or offensive; and (5) the employer knew or should have known about the harassing conduct but failed to take corrective action. Bailey v. USF Holland, Inc., 526 F.3d 880, 885 (6th Cir. 2008). "In determining whether the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment under the Harris standard, it is well-established that the court must consider the totality of circumstances." Williams v. Gen. Motors Corp., 187 F.3d 553, 562 (6th Cir. 1999) (citing Harris, 510 U.S. at 23).

Benefield has failed to establish that she was subject to unwelcome harassment. She offers no evidence of any inappropriate comments or behavior toward her at any time, which "weighs against a hostile work environment finding." Kean v. IT-Works, Inc., 466 F. App'x 468, 470 (6th Cir. 2012) (citing Black v. Zaring Homes, Inc., 104 F.3d 822, 826 (6th Cir. 1997)). Benefield has also failed to prove that any alleged harassment unreasonably interfered with her work performance, which requires showing that the work environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998). To determine whether an environment is sufficiently hostile or abusive, courts consider the following, non-exhaustive list of relevant factors:

> [T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

Harris, 510 U.S. at 23. Furthermore, the harassment "must be extreme to amount to a change in

the terms and conditions of employment." Faragher, 524 U.S. at 788. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Id.

The only comment about which Benefield has first-hand knowledge was contained in a text message Hyndman sent to another female employee, asking her to send home a "fat" female dancer who was working at a private club in the back of Virago. (Doc. No. 151-1 at 194.) The recipient of the message showed it to Benefield. She offers proof of three other second-hand accounts of Hyndman's comments about women's appearances. (Doc. No. 65 at 5.) Benefield worked at Virago for two and a-half years and at Hyndman's other restaurants approximately three years before starting at Virago. Benefield has not produced the testimony of a single woman who claims to have been harassed by Hyndman.

Viewing the totality of the circumstances in the light most favorable to Benefield, no reasonable jury could find that approximately four inappropriate comments in that period of time altered the conditions of her employment. Although Hyndman's comments about women's appearances were unprofessional and inappropriate, they were not sufficiently severe "to amount to a change in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). The frequency of Hyndman's comments was significantly less than other cases in which the Sixth Circuit has held that the offending comments were not sufficiently severe or pervasive as to alter the conditions of the employee's employment and create an abusive working environment. See, e.g., Clay v. United Parcel Serv., Inc., 501 F.3d 695, 707-08 (6th Cir. 2007) ("fifteen specific incidents spanning a two-year period," were "isolated" and "not pervasive"); Burnett v. Tyco Corp., 203 F.3d 980, 984-85 (6th Cir. 2000) (three sexually offensive remarks made by the supervisor in a six-month period did not constitute pervasive discriminatory

16

conduct); <u>Morris v. Oldham Cty. Fiscal Court</u>, 201 F.3d 784, 790 (6th Cir. 2000) ("several dirty jokes'" told in employee's presence, a verbal sexual advance, and isolated comments about the employee's lips and clothes did not constitute a hostile work environment). The Court grants MStreet's motion for summary judgment on the hostile work environment claim.

### B. Title VII and THRA Gender Discrimination Claims

Benefield claims that MStreet is liable for gender discrimination because Hyndman treated her differently than he treated the male Executive Chefs at the other MStreet restaurants and, ultimately, terminated her employment because of her gender. Benefield must make out a *prima facie* case of discrimination by showing that: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was "replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." <u>Wright v. Murray Guard, Inc.</u>, 455 F.3d 702, 707 (6th Cir. 2006).

Benefield's gender discrimination case fails because she was replaced by a woman, albeit as part of a male-female team. <u>Abeita v. TransAmerica Mailings, Inc.</u>, 159 F.3d 246, 253 (6th Cir. 1998) ("Plaintiff here fails on the fourth element because after she was fired, her responsibilities were split between a number of female [] employees."). She has also not provided any evidence that she was treated differently than any similarly situated employee who was not a member of the protected class. First, there were no similarly situated male Executive Chefs. Virago was the only MStreet restaurant that was losing money, which is the reason Hyndman and Martino had increased their presence at the restaurant and scrutiny of its costs. Second, Benefield admits that the requests made of her were no different than those made of the other Executive Chefs at MStreet, and that Martino and Hyndman had the same oversight and direction over the other chefs. (Doc. No. 65 at 22-23.) It is also undisputed that Hyndman and Martino requested changes to staffing

levels of male chefs as well, either through direct communication with the chef or indirectly through the front of house manager. (Doc. No. 49-12 at 52-55.) She also admits that she earned as much or more than the male Executive Chefs at the other three MStreet restaurants. (Id. at 23.) Accordingly, based on Benefield's admissions and the evidence in the record, Benefield has failed to provide evidence to establish a *prima facie* case of gender discrimination.

Furthermore, MStreet has proffered a legitimate, nondiscriminatory reason for her termination: "MStreet [] terminated Benefield because her sabotage of Virago on the night of June 20, her longstanding difficulties in working with others, and her refusal to make the necessary corrections to return Virago to profitability." (Doc. No. 47 at 21.) Benefield has not met her burden of demonstrating that this proffered reason is a pretext. Loyd v. Saint Joseph Mercy Oakland, 766 F.3d 580, 591 (6th Cir. 2014) (plaintiff unable to rebut employer's legitimate, nondiscriminatory reason for her termination, including her insubordination). First, Benefield has not shown that MStreet's stated reason had no basis in fact. Id. at 590. Viewing all evidence and inferences in Benefield's favor, the undisputed facts show at least one incident of Benefield loudly cursing at her supervisor, concerns by MStreet's directors and managers about her temperament, concerns by MStreet's directors about Virago's declining profitability, and texts Benefield sent to Martino the evening of June 20, 2013, threatening to "walk out" in the middle of a Thursday night dinner shift. (Doc. No. 136-1 at 2.) Second, Benefield has no evidence that the stated reason did not actually motivate the employer. Russell v. Univ. of Toledo, 537 F.3d 596, 607-08 (6th Cir. 2008) (rejecting employee's argument that employer was not actually motivated to terminate her by two identified acts of subordination, which followed a long history of complaints about employee's work performance and attitude). Third, MStreet's stated reason for her termination is clearly sufficient to warrant the adverse employment action. The Court grants MStreet's motion for

summary judgment on the gender discrimination claim.

### C. Title VII and THRA Retaliation Claims

Benefield claims that MStreet fired her in retaliation for the June 21, 2016 email she sent to Watkins complaining about Hyndman's alleged gender discrimination and harassment. As evidence of retaliation, Benefield points to MStreet's termination notice and its correspondence with the Tennessee DOL and the EEOC, each of which referenced her email as a reason for her termination. Benefield also points to the proximity in time between her sending the email and her termination. The evidence presented by MStreet creates a disputed issue of material fact on whether the decision to terminate was based on Benefield's job performance prior to June 21 or on her email sent on the morning of June 21st.

To establish a *prima facie* case of retaliation under Title VII, the plaintiff must show that (1) he or she engaged in protected activity; (2) the exercise of protected rights was known to the defendant; (3) the defendant took an adverse employment action against the plaintiff, and (4) there was a causal connection between the protected activity and the adverse action. Taylor v. Geithner, 703 F.3d 328, 336 (6th Cir. 2013). To establish a causal connection, the plaintiff must establish that his or her protected activity was a "but-for" cause of the alleged adverse action by the employer. University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517, 2533–34 (2013).

There are genuine disputes of material fact on Benefield's retaliation claim that preclude resolving this claim at the summary judgment stage. Benefield has established a *prima facie* retaliation claim. Her June 21, 2013 email was protected activity, and her termination was an adverse employment action. The Court infers in Benefield's favor the disputed evidence on MStreet's knowledge and causation. However, this case turns on whether the decision makers at

MStreet responsible for Benefield's termination were actually motivated by her protected activity or not. There is evidence to permit a jury to find either way. MStreet offers testimony by Martino and Hyndman that they decided to terminate her before Benefield's email was sent. However, the admissions by Watkins, in his capacity as the corporate human relations manager, in MStreet's termination notice and June 21st correspondence with the DOL and the EEOC, support a finding that Benefield's June 21st email was a "heavy" factor in the decision to terminate her. Watkins' email to the DOL is Benefield's strongest piece of evidence, as he stated on behalf of MStreet that he was attaching "the email that played a *heavy role* in determining her termination," and even labeled Benefield's email as the "Term Cause Email.pdf." (Doc. No. 151-7 at 51) (emphasis added). Although MStreet presents evidence that Watkins was not the decision-maker with respect to Benefield's termination and that his statements were incorrect (Doc. No. 70), that is contrary to the admission Watkins made as MStreet's agent, thus creating an inconsistency of material fact. Watkins signed Benefield's separation notice as the "Official or Representative of the Employer who has first-hand knowledge of the separation." (Doc. No. 151-7 at 52.) He is also identified himself on a DOL form as the individual "who discharged the claimant." (Id. at 52.) Watkins' admissions preclude entry of judgment on the retaliation claim at the summary judgment stage. Further, the close proximity in time between Benefield's protected activity and her termination is evidence from which a jury could conclude that the protected activity was the cause of her termination.

The Court also considers the impact of Judge Trauger's decision that a spoliation instruction will be given if this case goes to trial, as a result of MStreet's failure to preserve text messages from its critical managements and staff members that could have contained evidence relevant to the retaliation claim. The Court has all the text messages from Martino's cell phone,

which captures all text messages between Martino and Watkins and Martino and Hyndman. However, the parties agree that the text messages on Hyndman's and Watkins' cell phones were not saved, which most notably means the Court has no text messages sent between Hyndman and Watkins, both of whom were key to the termination decision or explaining the reasons for that decision. It is not possible to know what might have been contained in the text messages that were destroyed. The task of guessing the nature of destroyed evidence "is unavoidably imperfect, inasmuch as, in the absence of the destroyed evidence, we can only venture guesses with varying degrees of confidence as to what that missing evidence may have revealed." Kronisch v. United States, 150 F.3d 112, 127 (2d Cir. 1998). However, for purposes of summary judgment the Court can infer that text messages were a frequent medium for communication between MStreet's managers, and the missing text messages may have contained communications between Watkins and Hyndman adverse to MStreet on the retaliation claim. The inference of spoliation, in combination with Benefield's other evidence of retaliation, precludes summary judgment on the retaliation claim. Byrnie v. Cromwell, Bd. of Educ., 243 F.3d 93, 107 (2d Cir. 2001).

### D. Tennessee Public Protection Act and Common Law Retaliatory Discharge Claims

Under the Tennessee Public Protection Act ("TPPA"), an employee may not be discharged solely for refusing to participate in or remain silent about "illegal activities," Tenn. Code Ann. § 50–1–304(b), which are defined to include violations of state or federal criminal or civil codes or any regulation intended to protect the public health, safety, or welfare. Tenn. Code Ann. § 50–1–304(a)(3). Tennessee also recognizes a substantially similar common law claim for retaliatory discharge. "The TPPA essentially codified the common-law cause of action for retaliatory discharge" that had been articulated by the Tennessee Supreme Court two years earlier. Williams v. City of Burns, 465 S.W.3d 96, 110 (Tenn. 2015) (citing Chism v. Mid-S. Milling Co., 762

S.W.2d 552 (Tenn. 1988)). The Tennessee Supreme Court recently explained the differences between the two claims as follows:

> A statutory claim under the TPPA differs from the common-law claim for retaliatory discharge in two important respects. First, the common-law retaliatory discharge claim is available only to private-sector employees, but the TPPA extends protection to public employees as well. Second, under the common law, a plaintiff is required to show only that retaliation for the protected conduct was a "substantial factor" in the termination of his employment; in contrast, the TPPA requires the plaintiff to prove that retaliation for the protected conduct was the sole reason.

Williams, 465 S.W.3d at 110.

For the reasons stated above, Benefield has not shown that her email was the "sole reason" for her termination. As a result, judgment will be entered for MStreet on her TPPA claim. However, she has made a sufficient showing that her protected conduct may have been a "substantial factor" in her termination to survive summary judgment on her Tennessee common law claim.

## E. Hyndman's Tortious Interference with Employment Claim

To prevail on a claim for intentional interference with employment, a plaintiff must show that the defendant "intentionally and without justification procured the discharge of the employee in question." Ladd v. Roane Hosiery, Inc., 556 S.W.2d 758, 760 (Tenn. 1977). The Tennessee Supreme Court explained the standard for finding a director of the employer corporation liable for interfering with the employment relationship as follows:

> Since, with the exceptions noted, the discharge from employment of an employee-at-will by the employer is not actionable, but the wrongful interference with at-will employment by third persons is actionable, [the employee's] suit against [the corporate directors] can be maintained only if the proof establishes that they stood as third parties to the employment relationship at the time they performed the acts found to have caused [the employee's] discharge.
>
> ***
>
> [W]hen an officer, director, or employee of a corporation acts within the general

22

range of his authority, and his actions are substantially motivated by an intent to further the interest of the corporation, in claims of intentional interference with employment, the action of the officer, director, or employee is considered to be the action of the corporation and is entitled to the same immunity from liability.

Forrester v. Stockstill, 869 S.W.2d 328, 331, 334-35 (Tenn.1994). "[A] corporate director, officer, or employee may be liable for tortiously interfering with a corporate contract if he is acting outside the scope of his authority, acting with malice, or acting to serve his own interests." Id. at 333.

The undisputed facts before the Court do not support a finding by a trier of fact that Hyndman or Martino either stood as third parties to the employment relationship between MStreet and Benefield or were acting outside the scope of their authority, with malice, or in furtherance of their own interests. To the contrary, they were acting within the range of their authority and were substantially motivated by an intent to further the interest of Virago and MStreet. Accordingly, the Court grants MStreet's motion for summary judgment as to this claim.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** in part and **DENIES** in part MStreet's motion for summary judgment. (Doc. No. 46) The motion is **GRANTED** as to Benefield's claims for discrimination and hostile work environment under Title VII and the THRA, her TPPA claim, and her claim against Hyndman for tortious interference with employment. The motion is **DENIED** as to Benefield's claims for retaliation under Title VII, the THRA, and Tennessee common law.

An appropriate order shall issue.

_Waverly D. Crenshaw, Jr._
_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE

23